STATE ex rel. M. P. RYAN and Others v. DISTRICT COURT OF RAMSEY
COUNTY and Another.[1]

July 18, 1902.

Nos. 12,962—(30).

## City of St. Paul—Eminent Domain.

The citizens' charter of St. Paul, adopted May 1, 1900, lawfully con-
ferred upon the common council of that city the right to take private
property for public use upon just compensation being first made or
secured, and is not in violation of the home-rule amendment to the
constitution of 1898 (article 4, § 36).

## Same—Implied Power.

The right to exercise the power of eminent domain by cities and
villages of this state in laying out, opening, and improving streets is an
essential and incidental element of municipal government, impliedly
given to the commission provided for in the home-rule amendment of
the organic law, and effectuated by the legislature in the enabling act
of 1899 (c. 351).  State v. O'Connor, 81 Minn. 79, approved and followed.

## Constitution—Assessment for Local Improvement.

The amendment to the state constitution (article 9, § 1), so far as it
applies to making assessments for local improvements, and the manner
by which the same is to be prescribed by the legislature, construed in
connection with the home-rule amendment of 1898, and held not in con-
flict therewith.

## Same—Eminent Domain.

A charter adopted under the constitutional amendment of 1898, pre-
scribing appropriate means by which the power of eminent domain
may be exercised under due process of law, considered, and held valid,
and that such provisions were impliedly authorized by the legislature
in Laws 1899, c. 351, under which the citizens' charter might lawfully
impose duties upon the courts of this state in the condemnation of
private property for public uses.

Writ of certiorari issued out of the supreme court on the rela-
tion of M. P. Ryan and others to review a judgment of the district
court for Ramsey county, Kelly, J.  Affirmed.

[1] Reported in 91 N. W. 300.

*Durment & Moore,* for petitioners.

*James E. Markham, Franklin H. Griggs* and *Thomas McDermott,* for respondents.

LOVELY, J.

Certiorari to the district court of Ramsey county to return its records on the hearing of objections to special assessments levied under the new citizens' charter of St. Paul to pay for property condemned for approaches to the bridge connecting the river termini of Wabasha street in that city. The objections were overruled, and judgment was entered for the city.

Upon the petition of the contesting lot owners a sufficient return to the writ has been made to enable us to pass upon the right to appropriate the property required for the bridge improvement and the authority to assess abutting property to pay therefor. As we regard it, the most serious claim of relators upon this review is that the city could not, under its new charter, exercise the right of eminent domain. A consideration of this question necessarily involves much that is essential upon the right to make the disputed assessments, and we shall therefore dispose of it first.

The new charter of St. Paul was adopted in pursuance of the constitutional amendment of 1898, authorizing cities and villages to frame their own charters (Const. art. 4, § 36; Laws 1899, pp. v, vi, vii). It is substantially provided therein that, before any city or village shall be entitled to its benefits, a board of fifteen freeholders shall be appointed by the judges of the district court of the district where the city or village which desires to incorporate is situated, to return for submission to the electors the draft of a charter to be voted upon at the next election, and in terms that

"Before any city shall incorporate under this act the legislature shall prescribe by law the general limits within which such charter shall be framed; * * * but such charter shall always be in harmony with and subject to the constitution and laws of the state of Minnesota,"

and when duly ratified shall at the end of thirty days thereafter become the charter of such city or village and supersede any existing charter or amendments thereof. Also, that the legislature

may provide general laws relating to the affairs of cities, the application of which may be limited to municipalities of designated populations,

"Which shall apply equally to all such cities of either class, and which shall be paramount while in force to the provisions relating to the same matter included in the local charter."

To accomplish this change, an enabling statute was passed (Laws 1899, c. 351), which applied only to cities already organized. It adopted the language of the amendment itself, added regulations for the submission of the new charter to a popular vote, insured the protection of existing rights, restrained the power to incur local indebtedness within prescribed bounds, but, providing no framework of details to govern the commissions of freeholders in the formulation of the charters, left the duty in that respect to implication.

Within the year following, the new charter of St. Paul was submitted and ratified. When effect was attempted to be given to it, a quo warranto proceeding to test the title of the chief of police was brought to this court, wherein it was insisted that the enabling act and the charter adopted in pursuance thereof were in conflict with the amendment to the organic law upon the contention that the legislative act related only to cities already organized, while the amendment itself in express terms applied to all cities or villages, whether then existing or to incorporate thereafter. Upon a review of the historical conditions which led to the adoption of the amendment in 1898 in connection with its title we held the enabling statute valid. State v. O'Connor, 81 Minn. 79, 83 N. W. 498. It was also urged that the enabling act was ineffective for the reason that the amendment did not prescribe either general topics or specific restrictions within limits under which the new charters were to be framed. Upon this contention we further held (page 86), in the language of Justice BROWN, that the

"Authority to frame city charters is granted by the constitutional amendment, and ex necessitate extends to all powers properly belonging to the government of municipalities; and the require-

ment that the legislature shall prescribe limits within which such charter may be framed must be construed to mean limits beyond which the charter may not go. In other words, it is thus made, the duty of the legislature to provide such general limitations and restrictions as that body may deem expedient and proper."

We understand it to be conceded by relators here that there are in the new charter of St. Paul appropriate and plenary provisions to condemn land for public uses, as well as to authorize special assessments upon the abutting property, providing the condemnation can be made under the amendment of 1898, and the assessments sustained under article 9, § 1, as amended in 1869. It is urged, however, that the authority to take private property to improve the thoroughfares of the city being inherent in the state, there must be specific authority directly conferred by the legislature to authorize the exercise of this right, which has not been expressly given: hence that the condemnation is illegal, and these assessments void.

In the expression of abstract rights upon which judicial conclusions must rest, precision in statement and inference is essential. Words are very potent agents in the process of reasoning, and an inaccurate understanding or use of a word, term, or phrase often leads to fallacy and error of judgment. It is true that the right of eminent domain is not expressed in the constitution; hence, if it exists, it must be inherent. But we surmise that relator's counsel have not sufficiently discriminated between that which is inherent in the state and that which is inaccurately assumed to be inherent in the constitution, for the constitution must not be confounded with the state, nor with the absolute rights reserved to its people. Hence the statement that the right to exercise the sovereign power of eminent domain by the state, though strictly true, means exactly that it is reserved to the people, but the people may change their fundamental law by the methods prescribed therein in any manner not subversive of a republican form of government, or in any way that does not prescribe aristocratic or monarchial innovations. Hopkins v. City of Duluth, 81 Minn. 189, 83 N. W. 536. But, since the power of eminent domain is not expressly delegated to the

legislature, its existence, which is inherent, must be implied; and the courts, upon a consideration of its essential nature and effective application in the obvious necessity for its exercise by the highest popular element of state authority, have heretofore held it to be a legislative power. The duty therefore, to ascertain the public urgency for taking private property for public use has been assumed by the courts to originate in this popular branch of the government, and to depend upon legislative discretion in so far as the legislature is not restrained by the will of the people. Wilkin v. First Div. St. P. & P. R. Co., 16 Minn. 244 (271); Weir v. St. Paul, S. & T. F. R. Co., 18 Minn. 139 (155); State v. District Court of Hennepin Co., 83 Minn. 464, 86 N. W. 455; McGee v. Board of Co. Commrs. of Hennepin Co., 84 Minn. 472, 88 N. W. 6.

But, the people being the paramount source of power, it likewise follows that the legislature does not confer this right absolutely, nor beyond the reserved power of the people to confer it upon municipalities or their governing bodies, when by the fundamental law the legislative authority is abridged or changed in that respect by a different distribution or new gift of governmental authority. Upon a similar contention to that urged here under an amendment to the organic law of Missouri, which is the prototype of our own home-rule amendment to the constitution, the supreme court of that state held the following language, which we approve and adopt: "The people, * * * in their sovereign capacity and by their organic law, could delegate to the people of a municipality this power to frame a charter for its own local government as to matters falling properly within municipal regulation. * * * Such a right is entirely in accord with the genius of our institutions bringing the regulation and government of local affairs within the observation of those who are to be affected thereby, and at the same time preventing the officious and selfish intermeddling with the charters of our cities without the knowledge of those whose rights are affected. This court, regarding the constitution as supreme in authority, maintained the validity of the special charter adopted by Kansas City on April 8, 1889, in State

v. Field, 99 Mo. 352." Kansas v. Marsh, 140 Mo. 458, 467, 41 S. W. 943.

The validity of the home-rule article in the Missouri constitution has been acknowledged by the supreme court of the United States, who held that a charter framed under it was an organic act of the municipality, to be construed as organic acts are construed; also that a city incorporated thereunder was in a very just sense an "imperium in imperio," whose powers are self-appointing. St. Louis v. Western Union Tel. Co., 149 U. S. 465, 468, 13 Sup. Ct. 990.

The state of Washington adopted into its organic law a provision authorizing the people of municipalities in that state to frame their own charters, and its supreme court, in construing the effect of this grant, undoubtedly has to a large extent sustained the contention of relators. In re Cloherty, 2 Wash. 137, 27 Pac. 1064; City v. State, 4 Wash. 64, 29 Pac. 847; Tacoma v. City, 14 Wash. 288, 44 Pac. 655. So far as these decisions are opposed to the conclusions we have above expressed, after due consideration of the reasons upon which they are grounded, we cannot follow that court, but are of the opinion that the sounder view has been expressed by the court of last resort in Missouri.

It remains to be considered whether other limitations than those expressed in the home-rule amendment of our own constitution conflict with the powers granted by the new charter of St. Paul, for the charter to be framed must be in harmony therewith, as well as the laws of the state of Minnesota. The only express recognition in the constitution of the right of eminent domain is in section 13 of the bill of rights, which provides that "private property shall not be taken for public use without just compensation therefor first paid or secured." The right of compensation thus granted is absolute, precedent to the constitution itself, inherent without recognition therein; and no attempt to deprive the citizen of this incontestable right could be tolerated in any system of free government. This is secured in the new charter of St. Paul by apt provisions, which are incorporated therein to fulfil this guaranty.

Until 1891 the essential and necessary changes in local govern-

ment of cities were effected through special acts of the legislature, but in that year such legislation was prohibited by an amendment to the state constitution, now article 4, § 33, the effects of which were perspicuously pointed out in detail in State v. O'Connor, supra. It was, as we held there, to obviate the difficulties arising from the application of this prohibition against special legislation in municipalities, whereby different localities with varying interests were, in the practical operation of home government, denied material benefits, that the home-rule amendment of 1898 was adopted. The purpose of article 4, § 33, was to prohibit special legislation generally; the amendment of 1898 was to modify the former amendment to meet the particular demands of municipalities, and to allow the localities themselves, instead of the legislature, to prescribe the essential regulations demanded by differences in local situations and necessities. Ewing v. Hoblitzelle, 85 Mo. 64, 77. But, subject to this reserved power in the legislature, the constitution accorded to any city or village the right to frame and adopt a charter for its own government which might supply its specific wants. Charters thus adopted will, of necessity, be more or less at variance and unlike in many respects. This must have been in the contemplation of the people in adopting the home-rule amendment, which was not intended to conflict with the amendment of 1891 prohibiting special legislation, but to modify the same, as would have been done had the last amendment been tacked upon the former as a proviso or exception thereto. The enabling act of 1899 (c. 351) is in perfect accord with the spirit of the constitution. It was undoubtedly intended thereby that all subjects of municipal control should be within the purview of the citizens' charter, of which the people could avail themselves, and thus secure the adoption of a law which would of itself present a complete and effective municipal code. State v. Field, supra.

In State v. O'Connor, supra, we held, as already stated, that the right of the city was by the enabling act amply extended to all powers properly belonging to the government of municipalities, without being expressly designated therein, and that the organization of a police force and the appointment of its chief was a

municipal function. We are not inclined to limit or modify the effect of that opinion to exclude the right of the municipality to provide for the exercise of the power of eminent domain. Such right is essential and necessary to the very life and well-being. of city government, for upon it its welfare and progress beyond question depend. It is as necessary that there should be streets and bridges in a city, and that they be improved and extended, as that there should be a police force to walk thereon to protect its inhabitants. In the general law of the state providing for the incorporation of cities this right is recognized and conferred (G. S. 1894, §§ 1106–1172); and, if there is to be found in the legislative history of the state any special charter not conferring the right to take private property for public use upon just compensation being first made or secured, we have not been referred to it. We have not seen it. We should be surprised to find it; and, in view of the purpose of the home-rule amendment to the constitution, as well as the enabling act adopted to give it force, the view is not to be accepted that a benefit was intended by which an existing charter, having them established therein, might be superseded by one that did not confer these essential benefits to urban life. Hence the decision in State v. O'Connor, supra, is here affirmed, and extended to embrace this natural, reasonable, and necessary incident of municipal authority.

Again, it is further urged for relators that, even conceding that the home-rule amendment and the enabling act of 1899 authorized municipalities to exercise the power of eminent domain, the attempt to assess abutting property for special benefits is not justified, for the reason that the prior amendment to the constitution (article 9, § 1) provides that the necessary authority, as well as the manner in which local assessments are to be made, shall be prescribed by the legislature. Had the enabling act provided that assessments could be made to pay for property taken in invitum in any form heretofore adopted or in vogue, there would be no doubt that this duty had been complied with in the new charter of St. Paul, since the home-rule amendment is a modification of article 9, § 1, as amended in 1869, and that it was the purpose of the enabling

act of 1899 to give to cities and villages framing a new charter all the incidental rights heretofore secured by law to provide for an effective urban government, with whatever privileges and benefits the localities affected thereby previously enjoyed under the laws of this state.

Subsequent to the constitutional amendment of 1869, improvements by means of local assessments upon abutting property have been repeatedly authorized by the legislature, and have become a part of our state policy. This right has been attacked in the courts in various forms, but has been always sustained, until its existence and effective operation have come to be regarded as usual incidents to municipal existence; and it cannot be believed that the people, in adopting the later amendment of 1898, intended to forego its apparent and essential benefits. We have held above, upon the theory that the power of eminent domain is inherent in the state, that the people might confer that power upon citizens of municipalities framing their own charters. The state policy has adapted itself to the new condition and the later amendment of 1898 must be construed to retain existing rights with new ones. The enabling act of 1899 gave all that was presumably necessary to municipal control by implication in the absence of express restrictions therein, and we are required to hold that among such rights was also implied the authority to assess the property benefited to pay for local improvements, without which the new charter would be emasculated of indispensable utility.

It is still urged that the charter commission could not—as it undoubtedly attempted to do—confer jurisdiction on the district courts of the state to hear the questions involved in the condemnation of property for public use, nor prescribe the methods by which such issues should be determined. We need not take time to cite the various provisions of the citizens' charter itself relative to the judicial procedure provided for in such cases. It is sufficient to say that it prescribed an efficient legal practice by which the rights of the landowner are fully protected. An opportunity for hearing is given, with judgment to be rendered after hearing, thus embracing all the essential elements of due process

of law as defined by the highest authority (Trustees of Dartmouth College v. Woodward, 4 Wheat. 518); and, had the same practice been prescribed by the legislature, no question could have been raised as to the right of the courts to give appropriate judicial assistance in aiding the results to be secured (McGee v. Board of Co. Commrs. of Hennepin Co., 84 Minn. 472, 88 N. W. 6). That the new city charter of St. Paul prescribed a course of practice in this. respect, instead of the legislature, may distinguish the procedure in which the rights of the parties are to be determined, although it created no substantial distinction, but merely a formal difference in the exercise of the implied right.

In conclusion, a review of the questions discussed impresses upon our minds the view that the objections of relators arise from a hesitation to realize the effect of a radical departure in the adaptation of novel means to accomplish practical benefits to the people required by changes in the fundamental law. That the conservatism of the legal profession often leads its members to suspect every new reform is natural, and perhaps justifiable; but a careful examination of the new charter of St. Paul will disclose that the substantial rights of its citizens hitherto existing and attempted to be readjusted thereunder confer nothing detrimental to the public welfare, or that has not been heretofore sanctioned by the law of the land. The practical test of its efficiency, or the wisdom of the constitutional change, must be subjected to time and experience, and is a matter for the people of the state, and not for the courts, whose duty it is to give effect to the new system. Hopkins v. City of Duluth, 81 Minn. 189, 83 N. W. 536.

Judgment of district court is affirmed.