IN RE NISHNABOTNA RIVER IMPROVEMENT DISTRICT No.
Two. Appeal of A. J. FOCHT ET AL., Appellees,
from an order of the Board of Supervisors Estab-
lishing the District v. THE BOARD OF SUPERVISORS OF
FREMONT COUNTY, A. G. FISHER ET AL., Appellants.

**Drainage:** ESTABLISHMENT OF DISTRICT: RIGHT OF APPEAL FROM ORDER
1   OF SUPERVISORS. Under the statutes relating to the establishment
of drainage districts, an order establishing the district and
directing that the cost of the improvement be made at the
expense of the lands benefitted thereby is appealable, although no

appeal lies from an order of the board denying the establishment of a district because not for the public benefit or utility, or conducive to the public health or welfare.

Same: REPORT OF ENGINEER: OBJECTIONS: SUFFICIENCY. Under proceedings for the establishment of a drainage district it is the duty of an engineer appointed by the board to show in his report, among other things, the elevation of the lands, lakes, ponds and deep depressions of the district, and to make an estimate of the cost of carrying the water therefrom into a newly constructed channel, as the basis of an order by the board of supervisors for construction of the work; and where this is not done the objections should be clearly pointed out to the board. However, in this case the objections in a general way stated that the cost and expense of constructing the ditch exceeded the benefits, and was too burdensome to be borne by the land within the district, and, as the case was triable *de novo* on appeal were sufficient to permit the objectors to urge, both before the board and on appeal, that because of the engineer's failure to make an estimate of the cost and to show the facts the supervisors did not know and could not ascertain the cost of the improvement and were therefore without authority to order the same.

Same: ESTABLISHMENT OF DRAINAGE DISTRICT: EXPENSE: EVIDENCE. In this action the evidence is reviewed and it is held, that the construction of the drainage system proposed, involving the straightening of a very sinuous river carrying a considerable body of water was not justified, because of excessive cost and doubtful utility, and that the district court properly reversed the action of the board in establishing the same.

*Appeal from Fremont District Court.*—HON. W. R. GREEN, Judge.

SATURDAY, DECEMBER 18, 1909.

THIS is an appeal from an order of the district court reversing and setting aside an order of the board of supervisors establishing a river improvement and drainage district in Fremont County, Iowa.—*Affirmed.*

*W. H. Norcutt,* County Attorney, *J. C. Shockley,* and

*William Eaton,* for the appellant Board of Supervisors and others.

*W. E. Mitchell,* for appellees.

DEEMER, J.—On January 8, 1907, a petition was filed for the establishment of what was to be known as the "Nishnabotna River Improvement District No. 2," in Fremont County, Iowa. On the next day the board of supervisors approved said petition, and appointed one Seth Dean, a civil engineer, to make a report and survey thereon. The commissioner so appointed proceeded with the work, and on April 10th filed his report, etc., with the board. Thereupon notices were ordered and given pursuant to law, and May 27, 1907, was fixed as the time when objections and claims for damages should be filed. Within the time so fixed appellees and others, who were owners of lands within the proposed district, filed objections to and remonstrances against the improvement as reported by the commissioner. During the hearing of these objections, appellees also filed a motion to dismiss the proceedings and objections to the boards acting therein, for the reason, among others, that one H. C. Vanatta, a member of the board, was a landowner within the district, and was personally and financially interested in the establishment thereof. The matter proceeded without determination until August 5th, when appellees filed a motion for a continuance, in which they asked that the proceedings be postponed until after the first Monday in January, 1908, when a successor to the said Vanatta would be inducted into office. This motion was objected to, and the petitioners for the ditch also insisted that appellees had waived all objections to Vanatta's sitting in the case. On August 6, 1907, the board, by resolution, voted to establish the improvement and district; two of the members, one of whom was Vanatta, voting Aye, and the other members voting

No, and on September 27th the board, by resolution, finally established the drainage district as recommended by the commissioner, the vote on the final resolution being unanimous. Appellees, who constitute a large majority of the landowners within the district thereupon appealed to the district court, where the case came on for hearing at the January term thereof, resulting in a decree reversing and setting aside the action of the board of supervisors. The board and some of the petitioners for the ditch appeal.

The propositions made against the establishment of the district in the court below were as follows:

(1) Owing to the fact that one of the members of the board was interested in the establishment of the ditch, and voted in favor thereof, its establishment was without jurisdiction.

(2) No plat was filed prior to the establishment of the ditch as required by the statute.

(3) The establishment of said ditch is not for the best interests of the landowners of said district.

The trial court reversed the action of the board upon the third ground alone, although it intimated grave doubts regarding the sufficiency of the plat filed by the commissioner before the order for the establishment of the ditch was made. The objections to this plat were that it did not show the elevations of the several tracts of land within the district, and did not show in what manner the various tracts of land would be benefited. It is conceded that one of the members of the board of supervisors who voted in favor of the establishment of the district owned land therein.

The proposed improvement is an extensive and expensive one. The district embraces about eight thousand four hundred and forty-six acres of land, and the plan contemplates a change in the channel of the West Nishnabotna River from near the boundary line between Mills and Fremont Counties on the north for a distance nearly ten and

one-half miles in a southerly direction. This river is a stream about one hundred feet in width, and carries a constant flow of water. It is subject to periodic overflows, and drains large areas of land. The river bottom itself averages about one and one-half miles in width, and this bottom is subject to overflow in times of high water or heavy rains. During that part of its course which is material to our inquiry, it drains a territory about four miles in width on either side of the channel; and from the east four or five creeks, some of them of considerable size, empty into the river, while from the west five or more creeks empty into it. Some of these creeks drain large areas of land. In this connection we may say that the civil engineer did not before the establishment of the district by the board make any estimates of the cost of getting these streams connected up with the new channel or ditch, which was to carry the river water as well as the standing water upon some of the lands within the district. The evidence shows that nearly every year, and sometimes several times a year, the entire river bottom is covered with water from one to six feet in depth, and that little of the lands within this bottom can be cultivated with any degree of safety. The purpose of the proposed improvement is to reclaim these bottom lands, and save them from overflow by straightening the channel of the river. The estimated cost of the improvement without taking into account the connecting of the creeks with the new channel is something over $85,000, or, in other words, the expense, if borne ratably according to acreage, would amount to $10 per acre. The natural channel of the river through the proposed district is very tortuous; its length, as it now runs, being something like twenty miles. The fall of the old channel is about one and seven-tenths feet per mile. The proposed new channel as already observed, is something over ten miles long. It was to be twenty-four feet wide at the bottom and thirty-eight feet at the top, and its average depth was fourteen

feet. The fall of the new channel was to be about three
and three-tenths feet per mile. The proposed new ditch or
channel crosses the old one at something like thirty differ-
ent places, and the south end of this new channel was to
connect with the north end of a new channel made for the
river by some private parties who had undertaken to
straighten the course of the river to the Missouri state line,
a distance of something like fourteen miles.

In the river bottom are some sloughs, low places, and
bayous, in which water collects during floods and remains
until disposed of by evaporation. It is thought that by
straightening the channel of the river, and by increasing
its fall, the bottom lands can be reclaimed, and made fit
for agricultural purposes. The theory is that the new chan-
nel, although not nearly as large as the old, will gradually
be made larger by the rapid flow of water through it;
that until it is so enlarged the old channel will take care
of the surplus water; that, as the new channel is being
made larger, the old channel will gradually be filled up
by the deposit of silt, and that eventually the new channel
will not only take care of the flood waters, but that the
sloughs, bayous, and low places will be drained through
percolation, and that in the end the entire bottom will be
made fit for tillage. Appellants are not so bold as to
claim that all overflow will cease. They say in argument:

That a large portion of the district to subject to fre-
quent overflows, and most of it to overflow at time of extra-
ordinary floods which occur once in four or five years,
sometimes oftener. Ordinary floods occur frequently.
There are sloughs and low places in which water is re-
tained for a considerable time after flood, and is disposed
of by the slow process of evaporation. The first years after
the construction of the ditch the flood water will also flow
in present river channel and the increased flow will carry
away the water of local rains before floods from the tor-
tuous channel above the north county line bring down the
river floods, and reduce the number, extent, and duration

of overflows. The evidence shows that hundreds of acres are submerged but a few inches, and the increase of flowage and lowering of flood level would relieve this land from all except the extraordinary floods, and would so speedily relieve from extraordinary flood as to minimize the damage. The evidence shows that by cutting through low places and much slough land will be directly reclaimed, and the lowering of the water level will subdrain much land and greatly enhance the farming value of and increase the acreage that can be safely cultivated, and put to more valuable use than under present conditions. Evidence shows that at times of extraordinary floods the majority of lands upon which crops are damaged or destroyed is but a few inches under water, and the increased flowage and lowering of flood level would relieve vast bodies of land from the extraordinary floods or free them from water in so short a time that but little damage would be sustained.

This is, of course, problematical, and we shall presently refer more at length to these claims.

I. Since this case was tried in the district court, we have filed an opinion in *Denny v. Des Moines County,* reported in 143 Iowa, 466, upon which appellants place great reliance. The proposition advanced is this, that, as the matter of establishing drainage districts is purely a legislative function, all parties are concluded by the finding of the board of supervisors, and that there can be no appeal from its finding to the district court. From this premise it is argued that, as the district court had no jurisdiction of the matter, its order of reversal is of no validity, and that we should reverse the action of the district court, with instructions to dismiss the appeal and leave the matter with the board of supervisors for further action in the premises. It is true that in the *Denny* case we held there could not be an appeal from a finding of the board of supervisors that a proposed drainage was not for the public benefit or utility or conducive to public health, convenience, or welfare, for the reason that such question was

1. DRAINAGE: establishment of districts: right of appeal from order of supervisors.

legislative, and not judicial, in character. There was no
holding, however, that there could not be an appeal by any
one in such proceedings. That question was carefully
guarded in the opinion filed. We quote the following para-
graphs from the report of that case in proof of this asser-
tion. For instance, it is said:

No doubt a finding by the board of supervisors that
the petition is not sufficient in form or matter is judicial,
and subject to review on appeal to a court; but is a find-
ing that the board deems it best or not advisable to estab-
lish the district and make the public improvement, on the
ground that such action would, or would not, be conducive
to the public health, convenience, or welfare, or to the public
benefit or utility, subject to such review? . . . It
must be borne in mind that the appellants are asking the
district court to review on an appeal a finding by the su-
pervisors that they do not deem it best to establish the
drainage district in question, on the ground that it is not
for the public benefit or utility or welfare. If the statu-
tory appeal, which seems to be authorized in such cases,
is a valid exercise of power on the part of the district court
in this case, then the drainage district is to be established,
if at all, not because the supervisors deem it best, but be-
cause the district judge has reached that conclusion. . . .
It is well settled in this state that the Legislature may
provide for the exercise by a court of the power to ju-
dicially determine facts which are made the conditions on
which authority may be exercised by officers to whom is
delegated the exercise of legislative and executive power.
Thus a statute has been upheld which authorized a pro-
ceeding in the circuit court, as it formerly existed, to de-
termine whether justice and equity required that certain
described territory or any portion thereof, should be an-
nexed to a city or town; but this statute was upheld, as
against the constitutional objection founded upon the sep-
aration of the departments of government, only upon the
theory that the facts on which the court was to determine
the question were issuable facts, capable of judicial deter-
mination. . . . As already indicated, we think the
function of the board of supervisors in determining the

sufficiency of the petition for the establishment of a drainage district is judicial, and there is no reason why that judicial function might not have been vested in a court in the first instance had the Legislature so provided. . . . Questions relating to the establishment of a public highway are somewhat analogous, and it has been held that a statute authorizing a judicial tribunal to determine the existence of conditions specified therein as requiring the establishment of such highways are not unconstitutional, inasmuch as the question only of the necessity of the highway was to be submitted for judicial determination. . . . Of course, the Legislature may provide for a review in the courts of the action of a tribunal, legislative in character, which it has required to determine issues of a judicial nature; but it can not authorize such review of the exercise of a discretionary power. . . . We reach the conclusion that both on principles of sound reason and in accordance with the great weight of authority the lower court was right in holding that it had no jurisdiction to review the action of the board of supervisors in dismissing the proceeding instituted by these plaintiffs for the establishment of a drainage district, and its judgment is therefore affirmed.

In arriving at the doctrine announced in any case, we must always have in mind the particular facts of that case, the arguments used, and the conclusions reached. Not every statement found in a judicial opinion is to be regarded as the law of the case. Much that is said by way of argument is to be regarded as *dictum,* and the case is authority for nothing more than it expressly decides. What the *Denny* case really decides is that there can be no appeal to the district court from an order of the board of supervisors finding that a proposed drainage district is not for the public benefit or utility, or conducive to the public health, convenience, or welfare, and a refusal to establish the district on that account. That is quite a different proposition from an appeal by landowners within a proposed district, whose land is to be taxed with the expense of the proposed improvement, from an order of

the board establishing such a district, and ordering the improvement made at the expense of the landowners whose lands can only be taken in consideration of benefits conferred. In the one case no one's property is taken, and no one's possession is disturbed. In the other his property may be taken, his possession disturbed, and his lands appropriated for public or semipublic purposes. True, in the latter case the act of the board of supervisors is legislative or *quasi* legislative in character, but by statute it has some questions of fact to determine which may properly be made the subject of judicial review before the property of persons interested may be taken or made subject to an assessment tax. One example may serve as an illustration of this view: The fixing of railway, telegraph, telephone, and water rates is purely a legislative function, and no one can appeal from the failure or refusal of the proper legislative body to fix what are deemed to be reasonable rates, and, even when fixed, no one may appeal because they are not fixed low enough by the legislative body having the matter in hand. But it is perfectly proper for the company whose revenue is affected, or whose property is to be taken, to appeal to the courts to have the matter of the reasonableness of the rates fixed determined. Other illustrations might be given, but this will suffice.

Now the statute under consideration provides: "The board of supervisors at the session set for hearing on said petition, which session may be regular, special or adjourned, shall thereupon proceed to hear and determine the sufficiency of the petition in form and substance, at any time before final action thereon; and if deemed necessary the board may view the premises, and if they so find that such levee or drainage district would not be for the public benefit or utility or conducive to the public health, convenience or welfare, they shall dismiss the proceedings." Code Supp. 1907, section 1989-a5. Also: "When the time for final action shall have arrived after the filing of the

report of the appraisers, said board shall consider the amount of damage awarded in their final determination in regard to establishing such levee or drainage district, and if in their opinion, the cost of construction and the amount of damages awarded is not excessive and a greater burden than should be properly borne by the land benefited by the improvement, they shall locate and establish the same. . . . Any party aggrieved may appeal from the finding of the board in establishing or refusing to establish the improvement district, or from its findings in the allowance of damage, to the district court. . . . When the appeal is from the order of the board in establishing or refusing to establish the levee or drainage district, it shall be tried in equity and the appearance term shall be the trial term; the findings of the court in relation to the establishment or refusal to establish the levee or drainage district shall be certified by the clerk to the board of supervisors who shall enter an order in harmony therewith, and proceed accordingly. . . . If the appeal is from the action of the board in establishing or refusing to establish said drainage district, the court shall enter such order as may be proper in the premises and the clerk shall certify the same to the board of supervisors who shall proceed thereafter in such matter in accordance with the order of the court." Code Supp. 1907, section 1989-a6. In *Denny's* case the board had proceeded no further than to dismiss the proceedings under section 1989-a5, and it was held that from such an order no appeal would lie to the district court for reasons already stated.

Here the board made a contrary finding, and had also so far proceeded under the subsequent provisions of the statute as to locate and establish the district and ditch, appoint appraisers, and award the damages, from which appeal had been taken when the case was appealed to the district court. The record further shows that a permanent survey was made and approved, and that the board had

passed a resolution providing for the bonding of the district to procure the funds with which to pay for the improvement. That landowners whose lands have been taken or damaged, or whose property it is proposed shall be assessed, may be authorized to appeal from the finding of the board that the district should be established, and that the cost of construction and the amount of damages awarded was not excessive or a greater burden than should properly be borne by the land benefited, we have no doubt. See, as sustaining the view, *Stearns v. City,* 73 Vt. 281 (50 Atl. 1086, 58 L. R. A. 240, 87 Am. St. Rep. 721); *Dexter v. City,* 176 Mass. 247 (57 N. E. 379, 79 Am. St. Rep. 306); *French v. Barber Co.,* 181 U. S. 324 (21 Sup. Ct. 625, 45 L. Ed. 879); *Sisson v. Board,* 128 Iowa, 459; *Ill. Central Co. v. Chicago,* 141 Ill. 586 (30 N. E. 1044, 17 L. R. A. 530); *Fleming v. Hull,* 73 Iowa, 598; *McGee v. Board,* 84 Minn. 472 (88 N. W. 6); *State v. Crosby,* 92 Minn. 176 (99 N. W. 636); *Cooper's Case,* 22 N. Y. 84; *Young v. Salt Lake,* 24 Utah, 321 (67 Pac. 1066); *Nash v. Fries,* 129 Wis. 120 (108 N. W. 210); *Village v. Baker,* 172 U. S. 269 (19 Sup. Ct. 187, 43 L. Ed. 443). From the *Stearns* case we quote the following:

The very existence of the provision makes the question of necessity ultimately a judicial one. If it does not, the Legislature remains supreme in this regard, notwithstanding the Constitution. It is doubtless true that the people can not divest themselves of this attribute of their sovereignty; but the constitutional provision is not an abandonment of the right, but a regulation of the manner of its exercise. It gives to the judicial branch of the government a measure of power that would otherwise belong to the legislative branch. It says, in effect, that the courts shall see to it that property is not taken unless a necessity for its taking exists. If a legislative determination of the question of necessity would be conclusive in the absence of the constitutional provision, that provision, if it is to have any effect whatever, must deprive the legislative determination of its conclusive character. The statement in

*Foster v. Bank,* 57 Vt. 128, above cited, that any legislative act authorizing an appropriation of private property where the necessity does not exist is plainly in conflict with the Constitution, is apparently a recognition of this view; for how can the question of conflict with the Constitution arise if there can be no inquiry as to the necessity?

From the *Sisson* case we quote:

The initiative petition required must declare for a public use, and the board of supervisors convened in session and in the exercise of a judicial function well understood must find that the particular ditch or drain petitioned for will in fact result in a given benefit and be of community use.

From *McGee's* case we extract the following:

While it would be competent for the Legislature to ignore the judicial power entirely in providing for some work of improvement, and delegate the duties of taking the property and awarding compensation entirely to a body having no judicial attributes, yet the question whether such improvement is a public use, or the means of awarding just compensation, presents issues upon which the courts might be the final arbiters, and, again, the question whether the public use existed might depend upon facts involving the consideration whether the improvement would be adequate for the purpose it was intended. In either case the Legislature itself, or through a designated body, might determine such question, or might impose upon the courts the duty to determine the essential facts in some proper and appropriate method. . . . We must go further, and inquire into the character of the improvement; for, if the public use is to be determined by the court, such use may depend upon a consideration of disputable facts, as for instance, whether the establishment of the uniform height of water to be maintained is adequate for the only purpose upon which the right to take private property for public use can, under the precise terms of the statute, be made to depend, viz., the 'improvement of navigation and the protection of public health.' Upon these questions, which present issues of fact, involving the

utility of the improvement itself, it would seem proper, if
not necessary, for a court to hear evidence and determine
the disputed facts.  In doing so the court does not trench
upon legislative functions, but aids the legislative power by
its determination that it is consonant with the protection
of 'public health' or 'improvement of navigation.'  . . .
The state drainage law provides for the institution of a
ditch when the county commissioners decide that it will be
'of public benefit or utility or conduce to the public health,
convenience or welfare.'   The determination of the board
of commissioners is not in this respect conclusive.   An ap-
peal may be taken to the district court, and there that ques-
tion is finally decided.   Whenever an appeal is taken, the
action of the commissioners may be sustained in whole or
in part.

In *State v. Crosby, supra,* it is said:     "The con-
demnation of land through which such ditches may be con-
structed, the assessment of damages, and the determination
of the legal rights to parties affected are judicial.   The
exercise of both these powers is involved in proceedings
under this statute."

From *Cooper's* case we quote as follows:

The principle to be deduced from these extracts ob-
viously is that where any power is conferred upon a court
of justice, to be exercised by it, as a court, in the manner
and with the formalities used in its ordinary proceedings,
the action of such court is to be regarded as judicial, ir-
respective of the original nature of the power.   The Legis-
lature, by conferring any particular power upon a court,
virtually declares that it considers it a power which may
be most appropriately exercised under the modes and forms
of a judicial proceeding.   If, therefore, there were nothing
whatever to characterize the proceedings in this case as in
any respect judicial, except that they were had in the
exercise of a power conferred upon the Supreme Court as
a court, I should not hesitate to hold that they were sub-
ject to all the ordinary incidents of other proceedings in
courts of justice.

In *Field v. Clark,* 143 U. S. 649 (12 Sup. Ct. 495,

36 L. Ed. 294), it is said: "The Legislature can not delegate its power to make laws, but it can make a law to declare a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which can not be known to the law-making power, and which must therefore be a subject of inquiry outside of the halls of Legislature." From *Young's* case we take this: "It will be conceded that, while the Legislature can not delegate power to make laws, it may still make laws to take effect upon the ascertainment of certain facts and conditions, and may delegate the duty to determine the existence of such facts to some other branch of the government." In *Village v. Baker* it is said by the Supreme Court of the United States: "If the drainage laws of this state do not limit the burdens to the benefits derived, the entire acts are unconstitutional. The exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is to the extent of such excess a taking, under the guise of taxation, of private property for public use without compensation." Other cases might be cited in support of the conclusion reached, but enough have been noticed to fortify the proposition, and none have been found which reach a contrary result. We are clearly of opinion that the trial court had jurisdiction of the appeal. We have already considered many such appeals, and, although the question was not raised in these cases, it was necessarily assumed that jurisdiction existed, else the cases would not have been considered.

The rule for such appeals has thus been stated: "In view of the fact already mentioned that these duties are in a large measure legislative in character, and the further obvious truth that the supervisors are on the ground where they can see and know the situation as no one can see or

know it from the written or printed testimony, we are of
the opinion that the court should be very reluctant to in-
terfere and set aside their order on the ground that the
ditch is not a work of public utility, or its cost is a greater
burden than the lands benefited should bear, unless the
evidence in support of the objection is so clear as to ren-
der that conclusion unavoidable; and the burden of making
such showing is on the party attacking the order." *Temple
v. Hamilton Co.*, 134 Iowa, 706.   See, also, *Hartshorn v.
Wright Co.*, 142 Iowa, 72, wherein it is said: "It is said,
however, that the district court had power to reverse the
action of the board, and that to this extent the decree should
be upheld.   Of course, the court had such power; but, as
said in the *Temple* case, *supra,* the court should be very
reluctant to interfere with the action of the board upon
appeal, and should do so only upon clear, satisfactory and
convincing evidence that the ditch should be established."
But, as this is an appeal from the action of the district
court which undoubtedly proceeded with these rules in
mind, some weight should be attached to its findings be-
cause of its superior advantages to know the exact situation
by reason of having the witnesses before it and an oppor-
tunity to know the very truth of the matter.

II.   As already indicated, we shall not consider the
alleged disqualification of one of the members of the board.
Regarding the claim that the board did not have sufficient
information upon which to act and that the
civil engineer did not make an adequate or
sufficient report, plat, and profile, we shall
first quote the statute with reference thereto:

2. SAME: report
of engineer:
objections:
sufficiency.

"He shall make return of his proceedings to the county
auditor, which returns shall set forth the starting point,
the route, the terminus or termini of the said ditch or
ditches, drain, or drains, or other improvements, together
with a plat and profile showing the ditches, drains, or other
improvements, and the course and length of the drain or

drains through each tract of land and the elevation of all lakes, ponds, and deep depressions in said district, and the boundary of the proposed district, and the description of each tract of land therein and names of the owners thereof as shown by the transfer books in the auditor's office, together with the probable cost, and such other facts and recommendations as he may deem material." Code Supp. 1907, section 1989-a2.

The engineer appointed by the board did not in his report give any elevations of any of the lands, ponds, or lakes, or depressions in the proposed district, and these were not added to the plat and profile until December 4, 1907, which was after the appeal had been taken to the district court. Moreover, the engineer did not make any estimate as to the expense involved in carrying the water from the various creeks emptying into the old channel of the river to the new channel, and had not, down to the time of trial, made any such estimates. In *Zinser v. Board of Supervisors,* 137 Iowa, 665, we said, in speaking of the engineer's duty: "Unless he performs them, there is no assurance that the work will be prosecuted on scientific or economic lines. All interested have the right to know from him (1) whether in his opinion the improvement should be made, and, if so, (2) the character of such improvement; (3) the several tracts of land which will be affected and how each will be affected; (4) the probable cost of the improvement; (5) such other matters as he may deem material." Again, in the same case, we said: "To fully reclaim these lands, it will be necessary to excavate several lateral ditches not provided for. What these would cost is not disclosed by the record before us. To completely reclaim the land, much of it must be tiled, and no estimate of the cost of this is to be found in the record. The probable expense of these necessarily must be taken into account, as the only estimate of the value of the lands after the improvement is as reclaimed, and to fully reclaim them

the excavation of additional laterals and tile drainage is essential.    Had the benefits to be derived from the construction of the improvement proposed alone been taken into account in stating the increased value of the land, the necessity of the evidence mentioned would have been obviated.    And there is always some risk as to the success of the enterprise not to be overlooked."    In *Hartshorn v. Wright County,* 142 Iowa, 72, it is said:    "The ordinary member of a board of supervisors has no such knowledge of the subject of drainage, plans, and districts, as to justify leaving this matter to his judgment or discretion, and it was a wise requirement which limited the board in its final action to some plan which was approved by a competent engineer.    That point is clearly made in *Zinser v. Board,* 137 Iowa, 660.    In that case it is said that a report and plat from an engineer is required for various purposes, which are therein set forth, and that, until the return of a plat is made and recommended by him, the board should not order the construction of the proposed improvement."

This question was raised in the district court, but was not pointedly made in the objections filed before the board. It may be that for this reason the point should not have been considered by the trial court.    Yet as general objections were filed, and in these it was insisted that the cost and expenses of constructing the ditch far exceeded the benefits arising therefrom, and were too expensive and burdensome to be borne by the owners of the land within the district, and the case on appeal was triable *de novo* in the district court, the fact that no reliable estimate as to the full cost of the improvement had been made might under these objections be considered as a reason for not ordering the improvement and for reversing the order of the board of supervisors on the theory that it did not know, and could not ascertain, the cost and expense of the improvement.    In other words, under the objections, it was competent for the remonstrants and objectors to urge,

both before the board and the district court, that, because of the failure of the engineer to estimate the cost of carrying the water of the creeks into the new channel, the district should not be established because of the fact that this unknown expense added to the other estimate was more than the land should bear.

III.    The last and only other proposition which we shall consider is simply one of fact.    It is said that the finding of the board in the establishment of the improvement district should not have been disturbed by the trial court (1) for the reason that the board had better opportunity to determine the matter than the district court; (2) because the finding of the board should not be disturbed in the absence of a strong showing to the effect that it was and is erroneous; and (3) for the reason that the proceeding, if not legislative in character, is essentially so, and the action of the board should not be reversed save upon a practically conclusive showing of error.    We have already seen that the proceeding is not strictly legislative in character, and that the statute provides for a trial *de novo* upon appeal.    On the other hand, we have established a rule governing such cases upon appeal, and to that we must adhere.  · Going, then, to the merits of the case, we find that the estimated expenses of the improvement distributed ratably against the land supposed to be benefited without taking into account the unknown expense of conducting the water from the creeks into the new channel amounts to approximately ten dollars per acre.    It will be observed, too, that this is not an ordinary drainage scheme.    It involves the straightening of a very sinuous river carrying a considerable body of water.    This river has been subject to periodic overflows, and at these times the entire river bottom is covered by a large amount of water.    To accomplish its purpose, the new channel which is smaller than the natural one, must take

3. SAME: establishment of drainage district: expense: evidence.

care of this unusual amount of water during flood times and take care of the water in sloughs, ponds, and bayous during the ordinary stages of water in the river. The great preponderance of the testimony shows that the proposed new channel will not do this. Unless it takes care of the overflow, it is practically conceded that the scheme will prove a failure, or, at least, will not render the land tillable. A flood or two of the ordinary size during a season will render the land nonarable. Moreover, there is no reason to believe that the new channel will drain out the sloughs and wet places. The river, flowing in its present channel, has not done so. No provision being made for the water coming down into the bottoms from the creeks, which flow into the old channel, the scheme, even on appellants' theory, is incomplete. They insist that the old channel will be filled, as the new one is being broadened and deepened, from the deposit of silt and other substances carried in solution. If this be true, then the water coming from the creeks must either spread out over the bottom land or make new channels which can not well be foreseen, and for which adequate compensation can not be made in damages. The plans seem to be incomplete and unsatisfactory, and the theories advanced as to what will happen in the future do not seem to be based upon any reliable experience.

Again, it is shown that much of the water which floods the south part of the proposed district does not come from the river, the channel of which it is proposed to change; but from creeks, which drain large areas, coming from the northeast and the northwest, and the proposed ditch would, of course, have little or no effect upon this accumulation of water. Doubtless the northern part of the district would, under the testimony, be benefited by this improvement, but the entire scheme is so incomplete, so problematical, and the expense so uncertain that we are inclined to agree with the district court in its holding that it should

not have been approved and established. Appellants contend that much of the testimony for appellees was and is incompetent, in that it called for the opinions and conclusions of nonexpert witnesses. With this we can not agree. Perhaps some of the testimony was not admissible; but a great deal of it, of which appellant complains, was not only competent, but clearly the best and only evidence which could be produced. These witnesses were old residents who were familiar with the river and the river bottoms, and who had observed the situation during floods as well as when the river was at its ordinary stages. It is true that these witnesses, in response to direct questions calling for their opinions, stated that the drainage district would be of no benefit, which, perhaps, it was incompetent for them to do, but they also gave the facts and figures upon which those opinions were based, which facts are, of course, proper to be considered by the court.

One other thought is worthy of consideration. The new ditch crosses the old channel in something like thirty places. For a time, and at least for three years according to one estimate, the old channel will continue to take care of a part of the water and the new of a part. As soon as the new enlarges so as to take care of a considerable part of the water the old will be converted into ponds and bayous, and the water therein will undoubtedly become stagnant or if not full of stagnant water, the old channel can not be farmed or utilized. The new will by that time have become larger and broader even than the old channel, and no saving will be obtained. That the new channel will not carry the floods which do the principal damage seems to be firmly established by the testimony. That it will not take care of the present ponds and bayous seems certain, and that the plan will create more bayous and ponds is quite clear.

On the whole record, we are constrained to hold that the improvement district should not have been established

as ordered.   That another may be established which will cure all the evils which the proposed one will reach and at a small percentage of the expense seems reasonably clear.

The decree of the district court must be, and it is *affirmed.*